UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ALEJANDRO HERNANDEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:19-cv-02882-JMS-MPB |
| ) | |
| WEXFORD OF INDIANA, LLC, et al. ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING IN PART AND DENYING IN PART MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

A prison doctor diagnosed Alejandro Hernandez with an inguinal hernia in 2016. It continues to afflict him. So does a second hernia, which has bothered him since at least 2019. Mr. Hernandez's hernias cause him severe pain and hinder activities like lifting heavy objects and using the toilet.

Mr. Hernandez has sued the warden, two prison employees who reviewed his grievances, the doctor responsible for his care from 2016 through 2019, and the prison's medical contractor. The Court now considers the medical defendants' summary judgment motion.

Because a reasonable jury could find that the medical defendants were deliberately indifferent to Mr. Hernandez's serious medical needs from 2019 forward, their motion for summary judgment, dkt. [85], is **granted in part** and **denied in part**. In this order, the Court also **grants** the medical defendants' motion to strike Mr. Hernandez's surreply and designation of evidence, dkt. [101], and **directs the clerk** to update the docket to reflect that Mr. Hernandez's surreply and designation, dkts. [99] and [100], are **stricken**.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir.

2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Facts[1]

Mr. Hernandez has been incarcerated at Pendleton Correctional Facility (PCF) since at least 2016. From May 2016 until some point in 2019, Dr. Paul Talbot was a physician responsible for treating Mr. Hernandez and other PCF inmates. Beginning April 1, 2017, private contractor Wexford of Indiana, LLC was responsible for providing medical services to PCF inmates and was Dr. Talbot's employer.

### A. The First Hernia and Treatment Before February 25, 2019

The earliest documentation of Mr. Hernandez's hernias is a Request for Health Care dated April 24, 2016. Dkt. 95 at 8. Mr. Hernandez stated:

> I am still having problems with a [left] hernia. It is painful and swollen. I am hopeful that I can get this health issue resolved soon. This hernia causes me more problems than just pain. It affects my urination and bowel movement as well as mental fears of my health.

*Id.*

---

[1] The medical defendants' motion to strike Mr. Hernandez's surreply and designation of evidence, dkt. [101], is **granted**. The medical defendants did not "cite[] new evidence in the reply or object[] to the admissibility of the evidence cited in the response," so no surreply was warranted. S.D. Ind. L.R. 56-1(d). The **clerk is directed** to update the docket to reflect that Mr. Hernandez's surreply and designation of evidence, dkts. [99] and [100], are **stricken**. The Court has not considered evidence or arguments presented with the surreply.

3

The next week, Dr. Talbot examined Mr. Hernandez and diagnosed him with a "left direct inguinal hernia." Dkt. 87-4 at 1. "An inguinal hernia occurs when tissue, such as part of the intestine, protrudes through a weak spot in the abdominal muscles." Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited July 9, 2021). Dr. Talbot characterized the hernia as "barely perceptible" and "easily reducible." Dkt. 87-4 at 1. He planned to treat the hernia with "watchful waiting" and prescribed medication to treat pain and constipation. *Id.*

In late June 2016, Mr. Hernandez submitted another Request for Health Care. Dkt. 95 at 7. He stated:

> I am still in pain with my hernia and it is causing me problems. I have trouble using the toilet. The swelling is very tender and concerns me greatly. I have had this hernia for too long. This is one of several attempts to get some resolve.

*Id.* A month later, Dr. Talbot examined Mr. Hernandez again. This time, he found "no inguinal right or left hernia mass or mass effect," dkt. 87-4 at 3, even though hernias do not improve without treatment.[2] Neither Dr. Talbot's treatment notes nor his affidavit explain why he was able to detect a hernia in May 2016 but not in July 2016. *See* dkts. 87-1, 87-4 at 3.

In September 2016, Dr. Talbot met with Mr. Hernandez following a positive test for tuberculosis. Dkt. 87-4 at 5. Mr. Hernandez stated that his supportive hernia belt was in disrepair and requested a new one. *Id.* However, Mr. Hernandez did not receive a new hernia belt until 2019. *Id.* at 21. The medical records suggest that Dr. Talbot did not order a new hernia belt until 2019. *Compare id.* at 5–6 *to id.* at 18–20 (documenting request for new hernia belt).

Following his September 2016 visit with Dr. Talbot, Mr. Hernandez did not submit any Requests for Health Care regarding his hernia for over two years. During that time, Dr. Talbot

---

[2] Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 ("An inguinal hernia . . . doesn't improve on its own . . . .").

4

treated Mr. Hernandez for other medical needs, but his treatment records make no reference to the hernia. *See id.* at 8–17.

### B.     The Second Hernia and Dr. Talbot's Treatment After February 25, 2019

On February 25, 2019, Mr. Hernandez submitted a Request for Health Care reporting a "major bulge" in addition to his existing hernia. Dkt. 95 at 6. He reported that he was in "severe pain" and "suffering very badly." *Id.* A member of the healthcare staff examined Mr. Hernandez two days later. *Id.* Notes from that examination describe an "enlarged mass" and document hernias on the right and left sides. *Id.* Those notes indicate that Mr. Hernandez was constipated and describe his condition as "very painful." *Id.*

Dr. Talbot met with Mr. Hernandez the following day. Dkt. 87-4 at 18–20. His treatment notes acknowledge both hernias and describe them as "easily reducible." *Id.* Dr. Talbot ordered a new hernia belt and medication to treat Mr. Hernandez's complaints of constipation. *Id.* He described Mr. Hernandez's activities of daily living as "normal," specifically noting that Mr. Hernandez was able to work in the yard seven days per week. *Id.*

In July 2019, Mr. Hernandez submitted a Request for Health Care seeking treatment of worsening knee pain and his left inguinal hernia. Dkt. 95 at 5. Dr. Talbot examined Mr. Hernandez the same day. Dkt. 87-5 at 21–23. He gave Mr. Hernandez the hernia belt he ordered five months earlier and prescribed Tylenol for his pain. *Id.* Notes from this examination address Mr. Hernandez's *right* hernia but not the *left* hernia. *Id.* Dr. Talbot again stated that Mr. Hernandez's daily activities were "normal" and that he had "no limitations," specifically recognizing that Mr. Hernandez was able to work as a welder five days per week. *Id.* at 21. Dr. Talbot added that Mr. Hernandez "may need to change jobs" if his problems persisted. *Id.*

5

**C.     Treatment After Dr. Talbot**

Mr. Hernandez came under the care of Dr. Martial Knieser after Dr. Talbot moved to a different prison later in 2019. Dkt. 87-1 at ¶ 2. Dr. Knieser's only documented examination of Mr. Hernandez took place October 30, 2020, after this Court enjoined the defendants to arrange the examination and enact Dr. Knieser's recommended treatment. Dkts. 71, 72-1. Dr. Knieser identified "bilateral inguinal hernias with large defects with easily reducible bowel and fat." Dkt. 72-1 at 1. Dr. Knieser also deemed Mr. Hernandez "obese" because his body mass index (BMI) exceeded 30 and recommended that he lose weight. Dkt. 72-1. Dr. Knieser did not recommend any other treatment. *Id.*

At that examination, Mr. Hernandez measured 5'10" and 220 pounds. Dkt. 72-1. Since he first complained of his hernia, Mr. Hernandez measured less than 220 pounds only once: He weighed 217 pounds when Dr. Talbot examined him in September 2016. Dkt. 87-4 at 5–7. Every record available documents a BMI over 30. Yet Dr. Talbot never characterized Mr. Hernandez as obese, remarked on his weight, or counseled him to lose weight to relieve his hernias.

| Date | Weight | BMI | Citation |
|---|---|---|---|
| 05/03/2016 | 221 | 31.71 | Dkt. 87-4 at 2. |
| 07/25/2016 | 231 | 33.14 | Dkt. 87-4 at 3. |
| 09/26/2016 | 217 | 31.13 | Dkt. 87-4 at 5. |
| 05/10/2017 | Not recorded. | Not recorded. | Dkt. 87-4 at 8–10. |
| 07/31/2017 | 227 | 32.57 | Dkt. 87-4 at 12. |
| 03/14/2018 | 226 | 32.42 | Dkt. 87-4 at 16. |
| 02/25/2019 | 234 | Not recorded. | Dkt. 95 at 6. |
| 02/28/2019 | 233 | 33.43 | Dkt. 87-4 at 19. |
| 07/24/2019 | 220 | 31.56 | Dkt. 87-4 at 22. |
| 10/30/2020 | 222 | 31.56 | Dkt. 72-1 at 1. |

Dr. Michael Mitcheff, Wexford's Regional Medical Director, discussed Mr. Hernandez's condition with Dr. Knieser and prepared a declaration dated August 26, 2020. Dkt. 87-2. This declaration predates Dr. Knieser's only documented examination by two months. *Compare id. to*

dkt. 72-1. Dr. Mitcheff's declaration describes Mr. Hernandez as having one hernia—not two. *See* dkt. 87-2 at ¶¶ 4, 6, 8, 9, 11, 12. It does not cite any other medical records, but it also does not indicate that Dr. Mitcheff ever met with Mr. Hernandez or examined him in person.

Dr. Mitcheff concluded that Mr. Hernandez was overweight; that his hernia (it is not clear which one) was "reducible, small in size, and [was] not significantly impacting activities of daily living;" and that he was not "at risk of any serious harm." *Id.* at ¶¶ 8–10. In Dr. Mitcheff's opinion, Mr. Hernandez did not "require a surgical consult or surgery;" instead, he needed to continue to wear his hernia belt and to lose weight. *Id.* at ¶¶ 8, 11. By contrast, surgery would be "a consideration" for a hernia that "becomes large in size, is concerning for strangulation or incarceration, or is significantly impacting other functions." *Id.* at ¶ 10.

In his summary judgment declaration, Mr. Hernandez describes his hernias as continuing to cause "constant" pain. Dkt. 95 at 10. His hernias "hurt [him] all the time, day and night." Dkt. 87-3 at 7:17–18. This pain is "very severe" at times and reaches "as much as a 9 on a scale of ten." Dkt. 95 at 10. Mr. Hernandez's hernias cause "major issues" when he attempts to use the toilet, and he cannot lift more than ten pounds without pain. *Id.* He has coped with his hernias by modifying his daily activities. In September 2019, he left his welding job for a lower-paying job cleaning the law library. *Id.* He also cannot perform exercises that he could perform before his hernias progressed. *Id.*

Mr. Hernandez identifies two other PCF inmates who "had hernia issues" and "could not get treatment . . . without filing their law suits." *Id.* He asserts that one of these inmates "almost died from Wexford and Talbot not treating him." *Id.* The medical defendants have not addressed these allegations.

### III. Analysis

Mr. Hernandez asserts that Dr. Talbot and Wexford deprived him of the level of medical care required by the Eighth Amendment. "Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "As its name implies, deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "[T]he evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.*

As "a private corporation that has contracted to provide essential government services," Wexford "is subject to at least the same rules that apply to public entities." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017). This means "the *Monell* theory of municipal liability applies" to Mr. Hernandez's Eighth Amendment claims against Wexford. *Whiting v. Wexford Health Sources*, 839 F.3d 658, 664 (7th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379.

**A.     Claims Arising Before February 25, 2019**

The evidence makes clear that Mr. Hernandez's first hernia appeared by spring 2016. If his hernia constituted a serious medical condition at that time, no evidences shows that the defendants

8

were deliberately indifferent to it. Indeed, the record precludes a finding that the defendants were deliberately indifferent to Mr. Hernandez's serious medical needs until after he submitted his February 25, 2019 Request for Health Care.

Dr. Talbot had only three interactions with Mr. Hernandez's hernia before 2019. Mr. Hernandez first reported his hernia on April 24, 2016. Dkt. 95 at 8. Dr. Talbot diagnosed a "left direct inguinal hernia" the following week, proposed "watchful waiting," and prescribed medication to treat pain and constipation. *Id.* Mr. Hernandez filed a second Request for Health Care in June 2016, and Dr. Talbot examined him again in July. Dkt. 87-4 at 3; dkt. 95 at 7. And, in September 2016, Mr. Hernandez requested a new hernia belt during an appointment for an unrelated condition. Dkt. 87-4 at 5.

The record documents three complaints about Mr. Hernandez's hernia in five months in 2016. The treatment Dr. Talbot provided in response was by no means exemplary; to call it "conservative" would be generous. Dr. Talbot diagnosed a hernia at one appointment, failed to recognize it at the next, said he would order a hernia belt, and then failed to follow through for three years.

Even so, no evidence indicates that Mr. Hernandez complained that his hernia caused pain or limitations for the next two-and-a-half years. "A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Perry*, 990 F.3d at 511 (quoting *Greeno*, 414 F.3d at 653). In 2016, Mr. Hernandez's first hernia was diagnosed by a physician. However, Dr. Talbot determined that it simply needed to be monitored. No competing medical evidence contradicts that judgment, and the absence of any complaints for the next two years would lead a lay person to believe that the hernia did not present a serious risk to Mr. Hernandez's health.

If the two-year pause in complaints does not prevent the conclusion that Mr. Hernandez's hernia was not a serious health risk, it nevertheless prevents a finding of deliberate indifference. "A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting*, 839 F.3d at 662 (quoting *Farmer*, 511 U.S. at 837). "The state-of-mind element is measured subjectively: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.* If any information notified the prison medical staff of a serious risk to Mr. Hernandez's health between September 2016 and February 2019, there is no evidence of it in the record. As a result, no reasonable jury could conclude that Dr. Talbot or his colleagues actually inferred and ignored that Mr. Hernandez's hernias were causing serious problems during that period.

To be clear, the absence of evidence in the record does not mean Mr. Hernandez was free from pain or limitation between September 2016 and February 2019. Nor does it mean the medical staff was attentive to his needs. If the evidence discussed above proves anything, it proves that medical records do not always accurately document patients' conditions or complaints.

At summary judgment, though, "'a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Gekas*, 814 F.3d at 896 (quoting *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003)). If *any* evidence in the record—a treatment note, a Request for Health Care, a line from a declaration or a deposition—supported a reasonable inference that the medical staff knew before February 2019 that Mr. Hernandez was suffering serious pain or limitations, then a material factual dispute would preclude summary judgment. Because neither side has presented such evidence, the medical defendants are entitled to judgment as a matter of law for any acts or omissions that preceded February 25, 2019.

### B. Claims Against Dr. Talbot Since February 25, 2019

Conversely, a reasonable jury could find Dr. Talbot deliberately indifferent to Mr. Hernandez's serious medical needs after he resumed filing Requests for Health Care about his hernias in February 2019. At that point, Mr. Hernandez reported that he was "in severe pain" and "suffering very badly." Dkt. 95 at 6. His hernias imposed physical limitations that forced him to change prison jobs and affected his ability to use the toilet. Dkt. 95 at 10. Under Wexford's own hernia treatment guidelines, surgical repair should be considered when a hernia—even a reducible hernia—causes "substantial pain" and affects the patient's "ability to perform necessary activities of daily living in a prison environment." *Id.* at 13, 39.

A medical condition crosses the line from non-serious to "objectively serious once it becomes obvious to a layperson or 'has been diagnosed by a physician as mandating treatment.'" *Ortiz v. Webster*, 655 F.3d 731, 734 (7th Cir. 2011) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). If Mr. Hernandez's hernia was not serious when he began complaining in 2016, it crossed the line in February 2019. Viewed in the light most favorable to Mr. Hernandez, the evidence shows that the hernia was then causing substantial pain, limiting necessary activities, and warranted consideration for surgical repair under Wexford's standards.

"The real issue, then, is whether" Dr. Talbot "intentionally or with deliberate indifference ignored" Mr. Hernandez's hernias. *Id.* at 735. A reasonable jury could find that he did.

When Dr. Talbot met with Mr. Hernandez in February 2019, he had access to a Request for Health Care indicating that Mr. Hernandez's hernias were causing serious pain and interfering with bowel movements. Dkt. 95 at 6. Dr. Talbot ordered medication to treat constipation and finally ordered a hernia belt, but he offered no pain relief, and he inexplicably described

11

Mr. Hernandez's daily activities as "normal." Dkt. 87-4 at 18–20. It took Dr. Talbot *five months* to offer pain medication or actually provide Mr. Hernandez with the hernia belt. Dkt. 87-5 at 21–23.

When Dr. Talbot met with Mr. Hernandez again in July 2019, he gave attention to only one of Mr. Hernandez's hernias. *Id.* He acknowledged that Mr. Hernandez "may need to change jobs" because of physical limitations, but he also recorded that daily activities were "normal" and that he had "no limitations." *Id.* at 21.

Dr. Kneiser's revelation in October 2020 that Mr. Hernandez was obese also reflects poorly on Dr. Talbot's care. *See* dkt. 72-1. Mr. Hernandez was obese the entire time Dr. Talbot treated him, but Dr. Talbot never made note of that fact, much less counseled him to care for his hernias by losing weight.

A reasonable jury could find that Dr. Talbot's response to Mr. Hernandez's hernias from February 2019 forward "approach[ed] a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). Dr. Talbot received written evidence of two hernias but treated only one. He received complaints of severe pain but provided no relief. He received notice that Mr. Hernandez could not work at his job or use the toilet but wrote that his activities were normal and without limitation.

By Wexford's own standards, the symptoms Mr. Hernandez described in February 2019 warranted consideration for surgery. At minimum, a reasonable jury could find that Dr. Talbot's approach to Mr. Hernandez's hernias caused "an inexplicable delay in treatment which serve[d] no penological interest." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). Dr. Talbot is not entitled to summary judgment for acts or omissions taking place from February 2019 forward.

12

### C. Claims Against Wexford Since February 25, 2019

A reasonable jury could find both that Mr. Hernandez has suffered deliberate indifference to his serious medical needs *and* that a Wexford custom or practice caused that suffering. A plaintiff may prove a *Monell* claim by showing that his constitutional injury arose from a custom or practice of the defendant entity, even if that custom or practice "'has not received formal approval through the body's official decisionmaking channels.'" *Glisson*, 849 F.3d at 379 (quoting *Monell*, 436 U.S. at 690–691). Two key sets of facts would allow a reasonable jury to attribute Mr. Hernandez's constitutionally deficient medical care to Wexford's practices or customs.

First, Mr. Hernandez did not receive better treatment for his hernias once he left Dr. Talbot's care. Mr. Hernandez last saw Dr. Talbot in July 2019. He had no documented interactions with a physician for the next fifteen months. Dr. Mitcheff states that he discussed Mr. Hernandez's condition with Dr. Knieser sometime before August 26, 2020. Dkt. 86-2. But he only acknowledged one hernia (not two) and stated that it was "not significantly impacting activities of daily living" despite Mr. Hernandez's explicit statements to the contrary. *Id.* He determined that Mr. Hernandez should wear his hernia belt and lose weight. *Id.* Two months later, Dr. Knieser examined Mr. Hernandez, echoed that he needed to lose weight, and recommended no other treatment. Dkt. 72-1.

Mr. Hernandez has now been complaining for over two years that he has two hernias that cause constant, severe pain, limit his ability to work, and hinder his use of the toilet. In that time, three Wexford doctors have reviewed his case. Consistently, they have undercounted the number of hernias bothering him, recorded inaccurately that his hernias are not limiting him or affecting his daily activities, and declined to consider responsive treatment.

Second, Mr. Hernandez has "show[n] more than the deficiencies specific to his own experience." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). Mr. Hernandez specifically identifies two other PCF inmates who "had hernia issues . . . and could not get treatment . . . without filing their law suits." Dkt. 95 at 10. These are inmates he knows personally from his job at the law library and from his housing unit. *Id.* One, he says, "almost died" from untreated hernias. *Id.*

The medical defendants have not responded to these allegations, so the Court treats them as true for purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2); S.D. Ind. L.R. 56(f)(2). Additionally, the medical defendants' reliance on Mr. Hernandez's admission in his deposition that he is not aware of any Wexford policies—and his affirmative response to counsel's leading question whether he was simply "suing Wexford because Talbot didn't fix the hernia"—is misplaced. *See* Dkt. 87-3 at 30:16–32:1. Mr. Hernandez has presented evidence that a Wexford practice or custom caused him to receive woefully inadequate medical care, and the medical defendants have not rebutted it. A reasonable jury could resolve the *Monell* claim in Mr. Hernandez's favor, so Wexford is not entitled to summary judgment.

### IV. Conclusion

The medical defendants' motion to strike Mr. Hernandez's surreply and designation of evidence, dkt. [101], is **granted**. The **clerk is directed** to update the docket to reflect that Mr. Hernandez's surreply and designation, dkts. [99] and [100], are **stricken**.

The medical defendants' motion for summary judgment, dkt. [85], is **granted** with respect to acts or omissions preceding February 25, 2019. The motion for summary judgment is otherwise **denied**.

The Court will issue a separate order with instructions for resolving the remaining claims.

**IT IS SO ORDERED.**

Date: 7/20/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

ALEJANDRO HERNANDEZ
196476
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Thomas Joseph Flynn
INDIANA ATTORNEY GENERAL
tom.flynn@atg.in.gov

Adrienne Nicole Pope
INDIANA ATTORNEY GENERAL
adrienne.pope@atg.in.gov